LUDOVIC PIGNATELLI, Plaintiff, *v.* NEW YORK TRIBUNE, INC., Defendant.

(Supreme Court, Kings Special Term, December, 1921.)

Libel — publication of newspaper articles indicating plaintiff's disinclination to work — ridicule — defendant's motion for judgment on pleadings denied.

> Where the publication in a daily newspaper of two articles written of and concerning the plaintiff, the Prince d'Aragon, an ancient, noble and honorable family of Spain, indicating a disinclination on his part to avail himself of the opportunity to work which had been provided for him, may have tended to subject him to public ridicule and scorn, defendant's motion for judgment on the pleadings on the ground that neither of the articles is libelous *per se* and that in the absence of an allegation of special damage the complaint is fatally defective, will be denied.

MOTION for judgment.

Patterson & Brinckerhoff (John Patterson, of counsel), for plaintiff.

Sackett, Chapman, Brown & Cross (Harold L. Cross, of counsel), for defendant.

DIKE, J. This is a motion for judgment in an action for damages for alleged libel, two causes of action being set forth in the complaint, the defendant attacking each separately and contending that neither of the articles is libelous and, therefore, there being no allegation of special damages that the complaint is fatally defective.

Unless the two articles in question are not libelous *per se,* the defendant should prevail upon this motion. It is necessary, therefore, to examine the complaint to

discover if there are any peculiar features in this action, any personal element of the case, that calls for the application of any special rule. The complaint avers " that the plaintiff is of so-called noble birth, being the Prince d'Aragon, an ancient, noble and honorable family of Spain," having been a resident of the United States for ten years where " it is his intention to reside for the purpose of leading a modest and quiet life of independence, industry and democracy." The defendant newspaper contained in its issue of January 30, 1921, an article referring to the plaintiff herein with the headline: " Prince jumps job as carpet layer for hotel here," the message purporting to come from Atlantic City, " Titled son-in-law of G. Jason Waters revolts against work and retires to his Long Island estate." The special dispatch to the *Tribune* says in part, " Prince Ludovic Pignatelli d'Aragon is in revolt against work. Today it became known here that the descendant of a great house of Spain had defied his democratic father-in-law, G. Jason Waters, managing director of the Ambassador chain of hotels. and left the job," continuing as set forth in the moving papers herein. Again in a second dispatch purporting to come from Atlantic City on January 31, 1921, bearing headline, " Waters is through with Prince. Sorry he will not work. Head of Ambassador hotels says he tried in vain to make businessman of titled son-in-law," quoting the conversation with Waters to the effect " I'm sorry, but it is true that my titled son-in-law will not work. I am through with him;" and again later, " It was not a menial position, as I saw it reported in some newspapers. It was a good job with a good chance to go ahead. He lasted just one week, then he beat it back to Long Island," and continuing as set forth in the papers submitted herewith.

Supreme Court, December, 1921.   [Vol. 117.

Did these two articles, as they appeared in the daily publication of the defendant, hold the plaintiff up to public ridicule, contempt and scorn, and has he been made ridiculous and contemptible in the community and at all places where said publication was circulated, which is the effect of the articles as complained of in the complaint?

It may be necessary in deciding this motion, to examine the personal element as we may learn of it in the complaint. In Europe a so-called " leisure class " exists, and in no inconsiderable number, which in this country, compared with its population, is a very inconsiderable number. We are a nation of workers. It is the habit of Americans to work. Few sons of rich men here are drones. Many are in fact tireless workers. The men here who have nothing to do or other serious occupation save to worry over the inroads of the state and federal taxes upon their fixed incomes are comparatively a small number. But the plaintiff is of foreign birth. He has been brought up in a different environment, unquestionably a member of this leisure class in his own country. The two articles in question as published by the defendant would indicate a disinclination on the part of the plaintiff to avail himself of the opportunity of work which had been provided for him. The American residents of this country are credited with a delicate sense of humor. To the great majority here the episode as set forth by the defendant may have made of him, as he claims, an object of ridicule to the readers of this great daily. It is not the sting that he may have felt, it is the effect on the readers of the defendant that is the essential element. " Cervantes smiled Spain's chivalry away," a great Englishman said of a great Spaniard. Jenks, J., in the case of *Cohan* v. *New York Times Co.,* 153 App. Div. 242, on page 247, after dis-

cussing certain cases said: " For in each of them there was not publication of a mere matter of news, but the incident was used, not alone to point a moral, but to adorn a tale, narrated in a sensational vein, and there was presented the feature well described by Barrett, J., in *Moffatt* v. *Cauldwell,* 3 Hun, 26: ' It comes to this, that the question, whether or no the matter is libelous, so as to be actionable, depends upon the style, scope, spirit and motive of every such publication, taken in its entirety.' " And again in the case of *Church* v. *Tribune Assn.,* 135 App. Div. 30, the court said: " The language of the article is, of course, to be read and construed fairly and naturally, and the test whether it is or is not libelous *per se* is whether to the mind of an intelligent man the tenor of the article and the language used naturally import a criminal or disgraceful charge." This, it seems to me, is an extreme case. This law, of course, is perfectly sound; but the element of ridicule also may be equally important. The test here must naturally be: Was the plaintiff exposed to ridicule in such wise that his reputation was injured. Ridicule in and of itself, if it has harmful results, is sufficient. And these articles which may have naturally affected the risibility of readers may have attained wider notice because of the title borne by the plaintiff. This is the misfortune of the plaintiff in this affair and the penalty of being a prince. Whether the articles in question tended to subject the plaintiff to ridicule or contempt is the crux of the case. It is natural that the newspaper should be afforded generous scope to fairly and entertainingly report an incident, being mindful, however, that the particular case does not bring them within the prohibited limits and lay them open to a charge of libel. Mr. Newell, in his work on Slander and Libel, says: " While the public press cannot with

impunity ruin or affect a man's fair name or his affairs under the guise of joke or jest, on the other hand it need not be debarred from all humor, even of a personal kind that begets laughter and leaves no sting, otherwise its columns might become almost as dull as the pages of *The Gazette.*"

I hesitate to rule in any way that would tend to lessen the entertaining qualities of the defendant newspaper, but it seems to me that following *Moffatt* v. *Cauldwell, supra,* " the style, scope and spirit of the articles " as published by defendant taken in their entirety, make them libelous by fair and natural construction. *Triggs* v. *Sun Pub. Co.,* 179 N. Y. 144.

I am forced to the conclusion that the articles in question come within the prohibition of ridicule and contempt and I am constrained to deny the motion with ten dollars costs.

Motion denied.